**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

DAMARCUS REDMON,

     **Plaintiff,**

v.

                             **Case No. 18-2087-DDC-KGG**

GENERAL MOTORS COMPANY, et al.,

     **Defendants.**

## MEMORANDUM AND ORDER

This matter comes before the court on defendants General Motors Company and General Motors LLC, GMVM Fairfax Assembly Plant's Motion for Summary Judgment (Doc. 61). Plaintiff Damarcus Redmon has filed a Response (Doc. 68). And, defendants have filed a Reply (Doc. 70). For reasons explained below, the court grants defendants' summary judgment motion.

## I.     Uncontroverted Facts

The following facts are stipulated by the parties in the Pretrial Order (Doc. 58) or are uncontroverted for purposes of the parties' summary judgment motions. The Pretrial Order provides that all exhibits marked or used during depositions and all documents produced during discovery meet the evidentiary standards for foundation and authenticity. Doc. 58 at 6.

Defendants General Motors Company and General Motors LLC (collectively, "GM") are corporate or limited liability companies who manufacture automobiles across the United States and abroad, including at the GM Fairfax Assembly Plant ("Fairfax Plant") in Kansas City, Kansas.

### A.  Defendants' Policies

The GM Fairfax Plant is a unionized facility, and a local chapter of the United Auto Workers union ("UAW") represents a bargaining unit, which includes production and maintenance workers.  Plaintiff was a member of the bargaining unit and was covered by the collective bargaining agreement between GM and the UAW.  GM has Equal Employment Opportunity and Anti-Discrimination workplace policies that prohibit discrimination and harassment in the workplace based on protected characteristics (including race, sex, and gender) and retaliation for complaints of discrimination based on race, sex, gender, and other protected characteristics.

#### 1.  Attendance policies

GM provides new employees, including plaintiff (a temporary employee), with an orientation spanning multiple days.  Plaintiff received a copy of GM's orientation packet.  During this orientation program, GM reviewed its workplace policies, described above.  The orientation packet that plaintiff received contained language from GM's Equal Employment Opportunity and Anti-Harassment policies, which plaintiff testified he understood.  Doc. 68-5 at 23–25 (Redmon Dep. 21:1–23:15).  During orientation, plaintiff received and acknowledged his receipt of GM's Employee Attendance and Shop Rule Policy.  That policy provides that GM "may terminate . . . employment for unsatisfactory performance and disregard of GM's expectations [including] any unexcused absences, violation of Shop Rules or Plant/GM Policies."  Doc. 62-5 at 2.  During orientation, GM reviewed its attendance policy, and plaintiff understood that absences, without proper notification to management, constituted grounds for termination.  GM informed plaintiff, and plaintiff confirmed he understood, that attendance was mandatory for all temporary and flex employees.

GM also informed plaintiff, and plaintiff confirmed he understood, that he was required to call in any non-preapproved absences at least 30 minutes before his scheduled shift start time, and that calling in his absence did not mean the absence was approved. "If [a] . . . temporary employee calls in and state[s] that they are going to be absent and they give a date out in the future, they are not required to call in every day going forward. However, they are still required to call in 30 minutes prior to the start of their shift." Doc. 68-3 at 22 (Tutt Dep. 79:2–7). If a temporary employee misses two days of work, GM looks to the "specifics of the case"—such as the employee implying or notifying anyone that he planned to quit—to determine whether to release the employee. *Id.* at 23 (Tutt Dep. 81:24–82:22). "If the employee has called in stating that they are sick or injured, we will wait to see if we hear back from the employee. Until they have contacted GM to advise that they are actually medically unable to work, again, we will look at all of the information that we currently have to make a determination." *Id.* at 23 (Tutt Dep. 82:16–22). This information can include medical documentation.

### 2. Policies about employee complaints

If GM receives a complaint—either verbal or written—from an employee, GM's management reviews the complaint with the complainant, and then investigates the allegations in the complaint to decide whether to take disciplinary measures. GM asks the complainant and witnesses to write statements. GM also asks the complainant to identify any witnesses and may check to see who worked in the area where the incident occurred. GM recommends that employees conducting investigations note the steps they took in the investigation. The investigation is documented in both the complainant's file and the file of the employee named in the complaint.

### 3. Policies applicable to temporary employees

GM hires temporary employees to replace regular employees who are not working. Temporary employees cannot take a sick leave of absence; instead, they are placed on medical leave. Temporary employees receive opportunities to convert to permanent employees based on their employment start date. GM's policies for temporary employees provide that a temporary employee who violates a minor shop rule will receive a written warning or reprimand for their first and second violations, provided that the employee was hired at least 90 days before the violation. Employees may request a union representative when they receive a warning. These minor infractions are shop rule violations that would not result in a "time off" penalty for a regular employee. *Id.* (Tutt Dep. 81:4–6).

Temporary employees do not have seniority, but those who work at least 90 days also are eligible for 24 hours of unpaid time off, subject to management's approval. But, temporary employees do not have access to a process they can use to request positions based on their "restrictions and limitations," as defined by a doctor. Doc. 68-2 at 45 (Hawkins Dep. 43:1–4). GM allows for "favorable discharge" of temporary employees who cannot work for medical reasons. These favorable discharges allow employees to return to their positions once they are healthy enough to work. Doc. 68-10 at 11 (Heintzelman Dep. 9:10–18). GM also enters into "last chance agreements" with some employees—these agreements allow terminated employees to "return to work under . . . certain stipulations." *Id.* at 9–10 (Heintzelman Dep. 7:21–8:13). Sheila Heintzelman, a GM staff nurse, testified that she has observed GM enter into last chance agreements with former employees who had drug abuse issues and attendance problems. *Id.* (Heintzelman Dep. 8:7–13).

**B. Plaintiff's Employment**

Plaintiff Damarcus Redmon is male and African-American. In September 2015, he was hired as a five-days-per-week temporary employee at the GM Fairfax Plant. He started working at the plant on September 28, 2015, as an assembly line worker on the second shift, which starts at 2:30 p.m. The Fairfax Plant's assembly line has a moving conveyor belt where employees place parts onto a vehicle and inspect it as it moves along the belt. Employees working at the Fairfax Plant must be able to walk and stand to perform their jobs, regardless of their assigned department.

Plaintiff began working at GM in the Chassis Department on the "show-line." This arrangement required him to assemble the gas cap and the fiber glass cover for hoods. He was reassigned to the "motor-line" before June 2016 and remained on that line until he was fired in November 2016. His duties on the motor-line included operating a crane. The crane manipulated a machine, which connected the transmission to the motor in the vehicles manufactured by the machine. Plaintiff worked in a three-man team, and his job required him to use the crane to pick up the transmission, guide it to the machine, and drop it into a motor that already had been placed on the machine. After dropping the transmission into place, plaintiff pushed the transmission and motor together so the next person on the assembly line could bolt them to one another. Plaintiff also worked on the wire harness team. His job there involved taking wire harnesses out of their delivery boxes, placing them on motors, and using a small drill to secure the wire in prefabricated holes on the motors. Plaintiff did no heavy lifting, and he and other GM employees sat down during the machine's cycle.

### C. Plaintiff's Complaints

#### 1. Plaintiff's complaint about Austin Cornelius

On October 8, 2015, plaintiff made a complaint to Labor Relations Representative
Michael Poirier against his co-worker, Austin Cornelius. Mr. Cornelius had no supervisory or
managerial responsibilities, and he worked in the same department but in a different group, team,
and shift from plaintiff. Plaintiff reported that Mr. Cornelius (1) threw an item at the back of
plaintiff's head; (2) called plaintiff a "little bitch"; (3) grabbed and twisted plaintiff's nipples;
and (4) poked and grabbed plaintiff on the side and lower back. Also, plaintiff asserted that Mr.
Cornelius said the music plaintiff listened to made Mr. Cornelius's ears bleed and that plaintiff
looked like a gay rapper named "Baby." Doc. 68 at 11–12.

Plaintiff identified co-worker Josepha Lara-Smith as a witness to Mr. Cornelius's
conduct. Mr. Poirier requested a statement from plaintiff and Ms. Lara-Smith about plaintiff's
allegations. Mr. Poirier also spoke with Mr. Cornelius. Mr. Cornelius admitted hitting plaintiff
in the back of the head with a cap—though he asserted it was accidental—and admitted to
poking plaintiff. But, he denied the other allegations. Plaintiff did not know why Mr. Cornelius
threw an object at the back of his head, but he testified that it was not sexual. Doc. 68-5 at 47–48
(Redmon Dep. 45:14–46:16). Plaintiff believes that Mr. Cornelius and other GM employees
sexually harassed and racially discriminated against him in violation of GM's policies. Doc. 68-
4 at 3. Ms. Lara-Smith told Mr. Poirier that she witnessed an object hit plaintiff. Specifically,
Ms. Lara-Smith told Mr. Poirier that she saw Mr. Cornelius throw an object, but that Mr.
Cornelius was playing with another coworker and he missed the coworker, hitting Mr. Redmon.
She denied any knowledge about the other allegations. Ms. Lara-Smith also told Mr. Poirier that
she did not personally witness Mr. Cornelius touch plaintiff or witness plaintiff "touch or do
anything with" Mr. Cornelius. Doc. 68 at 12.

Mr. Poirier issued Mr. Cornelius an "Employee Contact" (a form of counseling that is not formal discipline) and reminded Mr. Cornelius that GM does not tolerate harassment. Mr. Poirier warned Mr. Cornelius that violating the Anti-Harassment policy, or other unsatisfactory job performance, could result in disciplinary action, up to and including termination. Mr. Poirier wrote in an email to GM's corporate representative, Ca-Sandra Tutt, that he did not "spend too much time" on the investigation and reviewed an Employee Contact document in another employee's file involving Mr. Cornelius. *Id.* at 29. GM placed all the information about plaintiff's complaint against Mr. Cornelius in the employee folders of plaintiff and Mr. Cornelius.

After complaining about Mr. Cornelius's conduct, plaintiff testified that he was "pulled" into the office of another employee, Al Patinel, at least twice. Doc. 68-5 at 96 (Redmon Dep. 96:18–22). Mr. Patinel said plaintiff hadn't put certain parts on cars moving through the assembly line that plaintiff "kn[ew] for a fact [he] was putting on." *Id.* at 101 (Redmon Dep. 99:2–10). Plaintiff testified that he didn't know why he had been called into Mr. Patinel's office, though he thought it "had something to do with" his complaint. *Id.* at 98 (Redmon Dep. 98:5–7). Plaintiff testified that Mr. Patinel "threaten[ed]" plaintiff's "seniority job"—which plaintiff described as an easier job typically performed by employees with seniority. *Id.* at 99 (Redmon Dep. 99:11–22).

Within two business days of plaintiff's complaint against Mr. Cornelius, Mr. Poirier moved Mr. Cornelius from the Chassis Department, "directly by" plaintiff, to the Trim Department. Doc. 62-3 at 31 (Redmon Dep. 76:8–15). After Mr. Cornelius was transferred, plaintiff had no further discussions or physical contact with Mr. Cornelius. Mr. Cornelius also made no gestures at plaintiff. But, plaintiff asserted, Mr. Cornelius often visited his mother at

the motor-line where plaintiff was moved. Plaintiff also stated that Mr. Cornelius "create[d] an uncomfortable and unwanted work environment by sitting directly across from [plaintiff] at lunch as to intimidate [him] for reporting the sexual harassment." Doc. 68-4 at 3 (Redmon Aff. ¶ 16).

Plaintiff did not report any incidents of sexual or racial discrimination or harassment between November 2015 and his birthday in May 2016.

### 2. Plaintiff's complaint about Mayra Hernandez

On June 2, 2016, plaintiff reported to Mr. Poirier that he had received two penis-shaped cakes from his co-workers for his birthday on May 26, 2016. Plaintiff posted pictures of the two cakes on his Facebook page on May 26. With the picture, he posted the following text: "The reason why I can't wear basketball shorts or sweats to work, they will call me Big D at work, and here's my birthday cake. LOL." Doc. 62 at 16 (first citing Doc. 62-3 at 39–40, (Redmon Dep. 109:18–110:6), 41–42 (121:25–122:2); then citing Doc. 67-2 at 4–5 (Facebook images)). The cakes were frosted differently: one had light chocolate frosting, and the other had dark chocolate frosting. They were two feet long and one foot wide, with blueberries. Plaintiff reported that someone told him the blueberries either represented African-American pubic hair or herpes. Other employees witnessed plaintiff receiving the cakes during working hours.

Plaintiff's supervisor, Joe Heany, was present when plaintiff received the two cakes. Plaintiff reported to Mr. Heany that he was uncomfortable with the cakes and that they were unwelcome and offensive. Doc. 68-4 at 3 (Redmon Aff. ¶ 17), 5 (Redmon Aff. ¶ 28). But, plaintiff testified, Mr. Heany took no action after plaintiff made this report. GM's corporate representative, Ms. Tutt, testified that the cakes could be considered offensive. And, GM

admitted that images and depictions of penises are inappropriate for the GM work environment. Doc. 68-11 at 3.

Plaintiff informed Mr. Poirier that the cakes were baked by his co-worker, Mayra Hernandez, and he explained in his complaint why the conduct was unwelcome and offensive to him. Ms. Hernandez had no supervisory or managerial responsibilities. Mr. Poirier spoke with Ms. Hernandez, who denied baking the cakes. Ms. Hernandez expressed surprise to Mr. Poirier that plaintiff had complained about the cakes. She reported that plaintiff had laughed at the cakes and showed no indication he was offended by them. Doc. 62-6 at 4 (Poirier Decl. ¶ 14). But, plaintiff stated in an affidavit that he "never welcomed or encouraged sexually explicit conversations at work and was highly offended when [he] received the cakes." Doc. 68-4 at 3 (Redmon Aff. ¶ 18). GM did not interview anyone other than Ms. Hernandez to discern who had made the cakes. GM's corporate representative, Ms. Tutt, testified that no documentation existed to indicate Mr. Poirier had completed an investigation summary. GM did not review plaintiff's complaint with him, nor did GM ask plaintiff to disclose any witnesses of the incident.

Mr. Poirier issued Ms. Hernandez an Employee Contact—which is not formal discipline—where he reminded her that GM does not tolerate harassment. Specifically, Mr. Poirier warned Ms. Hernandez that violating the Anti-Harassment policy, or other unsatisfactory job performance, could result in disciplinary action up to and including termination. Doc. 62-6 at 4 (Poirier Decl. ¶ 16). Ms. Hernandez was not moved to another area of the plant. Also, she was not suspended or terminated.

Plaintiff was able to perform the physical tasks of his job but testified that the workplace was a "stressful environment" because he was around people who had touched him in the wrong way or thought of him as a "sexual object." Doc. 68-5 at 144 (Redmon Dep. 142:6–16).

Plaintiff also testified that other employees commented and joked about plaintiff's penis, its size, and its relationship to his African-American heritage.[1]

### D.  Plaintiff's Layoff

Beginning in June 2016, plaintiff was absent from work at the GM Fairfax Plant.  He testified that he called the absentee line number provided to him from June 2016 until September 2016 to inform GM that he would be absent from work because he was sick.  GM has no records of the Central Time call-in log from June 2016 until September 2016.  On June 14, 2016, plaintiff was laid off from the GM Fairfax Plant, because he had not come to work.  On July 1, 2016, plaintiff returned to GM's Medical Department for a "Return to Work Evaluation," but he was not reinstated.  Doc. 68 at 35.

On September 26, 2016, plaintiff again returned to the GM Fairfax Plant and presented medical documentation for his absence, which he was told to bring when he returned to work.  During his fitness for duty examination, plaintiff informed the GM Fairfax Plant Medical Department that he had been absent because of pulmonary embolisms and had received treatment for his condition.  Nurse Sheila Heintzelman examined plaintiff and concluded he was fit to return to work without restrictions.  Also on September 26, 2016, plaintiff completed a "Return to Work Questionnaire."  The Questionnaire reflected that plaintiff could return to full-duty work from "[d]isability or [c]ompensable [l]eave."  *Id.* at 35.  The discharge was removed from plaintiff's record and was coded as a layoff because plaintiff had been unable to perform his job.

Accordingly, plaintiff was recalled from layoff effective on September 26, 2016.  On September 29, 2016, plaintiff was offered, and accepted, the opportunity to convert from a five-

---

[1]    Nothing in the summary judgment record suggests that Mr. Redmon made any internal complaints about this behavior.

days-per-week temporary employee to a two-days-per-week temporary employee, effective October 31, 2016. This conversion opportunity was offered to other five-day temporary employees at the GM Fairfax Plant.

### E. Plaintiff's Termination

Beginning on October 10, 2016, plaintiff again was absent from work at the GM Fairfax Plant. Between October 10, 2016, and November 2, 2016, plaintiff did not contact the UAW Committeeperson, the GM Fairfax Plant Labor Relations/Employment offices, or the GM Fairfax Plant Medical Department about his absences. Plaintiff's employment was terminated from the GM Fairfax Plant on November 2, 2016.

In November 2016, plaintiff spoke with Dwayne Hawkins, his UAW Committeeperson, about his termination. Plaintiff requested a leave of absence from GM but was ineligible because he was a temporary employee. Mr. Hawkins spoke with GM Fairfax Plant Personnel Director Rita Derencius about the termination. Plaintiff was offered a position as a two-days-per-week temporary employee with a new hire date for purposes of his seniority.

Plaintiff failed to report to work on November 28, 2016, rejecting the offer of a position as a two-day temporary employee. GM represented that plaintiff was terminated because of "[u]nexcused absences from work and failure to properly report." *Id.* at 36. GM also represented that plaintiff had not received management approval or notified management of his absences at least 30 minutes before his shift start time. But, plaintiff asserts that he followed GM's policy and reported his absences in October and November 2016. He asserts that GM has "no way to ascertain precisely when [p]laintiff called his absences in" because GM's timekeeping system doesn't record calls to report absences when they begin—instead, the system records calls when they end. *Id.* at 16. Also, plaintiff asserts that GM's policy does not require

employees to call in every day once they have reported an absence with a future return date. GM asserted that plaintiff was given a verbal warning, but plaintiff was given no disciplinary verbal, written, or final warning about his attendance. Plaintiff also recorded a conversation with GM nurse Sheila Heintzelman, during which Ms. Heintzelman told plaintiff that he received a "favorable discharge"—meaning that he was "not terminated for disciplinary reasons." *Id.* at 17 (citing Doc. 68-10 at 14–15 (Heintzelman Dep. 12:17–13:3)). Ms. Heintzelman also authored a nurse's note stating that plaintiff was "terminated for unknown reasons." *Id.* (citing Doc. 68-10 at 36 (Heintzelman Dep. 34:4–9)).

### F. Plaintiff's Disability

During plaintiff's employment with GM, he was diagnosed with pulmonary embolisms, deep vein thrombosis, and a tumor on his lung. He also was diagnosed with cardiomyopathy, disseminate distoplasmosis, and hypercoagulable state, beginning in June 2016. One of plaintiff's treating physicians, Lawrence Dall, opined that at least from October 2016 until at least December 16, 2016, plaintiff was "not in a position to work at the assembly line." Doc. 68-9 at 14 (Dall Dep. 12:18–23). Mr. Dall explained that he assumed the assembly line work was a "very active type of physical labor," and that he didn't have any personal knowledge of the assembly line jobs, or any jobs, at GM. *Id.* at 15 (Dall Dep. 13:1–12). He testified that, at the time of Mr. Dall's deposition, plaintiff had shown clinical improvement and could go back to work.

On November 17, 2016, plaintiff presented Jane Stark, a doctor working in GM's Medical Department, with a note from the Mayo Clinic. The note asserted that plaintiff needed to "refrain from strenuous activities." Doc. 68 at 37. Ms. Stark interpreted this restriction to mean plaintiff only could perform sedentary work. GM did not have a record from plaintiff's

doctor restricting him to sedentary work. But, GM's doctor recommended returning plaintiff to sedentary, self-paced work with the ability to sit down as needed throughout the day. GM does not have sedentary positions available to non-seniority-based employees. Doc. 68-11 at 7.

The Social Security Administration ("SSA") determined that plaintiff was disabled, effective November 30, 2016. That determination established that plaintiff was disabled within two weeks of his rejection of GM's offer to rehire him as a two-days-per-week temporary employee. Since then, plaintiff has not returned to the SSA to have the disability determination reversed or modified. He participates in an SSA program called "Right to Work," under which his disability status is subject to modification. Doc. 68-5 (Redmon Dep. 257:22–258:3), 320 (Redmon Dep. 318:4–23). On December 14, 2016, the Kansas Department of Labor completed an Able and Available Statement of Medical Condition for plaintiff, reflecting that he was able to perform "light duty work that did not include strenuous activity on his heart, lungs[,] or chest." Doc. 68 at 34. On December 16, 2016, plaintiff represented to the Kansas Department of Labor that he was unable to work. Plaintiff applied for three jobs in December 2016 and then, on November 5, 2018, plaintiff began training at Alliance Data. There, he receives $15 per hour.

### G. Equal Employment Opportunity Commission Charges of Discrimination

On November 18, 2016, more than 180[2] days after his complaint about Mr. Cornelius, plaintiff filed his first Charge of Discrimination with the Equal Employment Opportunity

---

[2] The relevant statute, 42 U.S.C. § 2000e-5, provides the following:

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency . . . such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the

Commission ("EEOC"). In that Charge, plaintiff checked boxes indicating that race, color, sex, and disability all were bases for the alleged discrimination, but he did not check the box for retaliation. And, on March 22, 2017, plaintiff filed an Amended Charge of Discrimination with the EEOC. He again checked the form's boxes for race, color, sex, and disability, but not retaliation. In his Amended Charge, plaintiff explained that he had "received a favorable termination and was eligible for rehire," but his "termination based on [his] disability caused [him] to lose [his] full time temp status and the benefits therein." Doc. 1-1 at 1.

In their Answer to plaintiff's Complaint, defendants asserted that plaintiff had not exhausted his administrative remedies for his retaliation claim.

Around April 24, 2017, plaintiff filed a Charge of Discrimination with the Kansas Human Rights Commission. In this Charge, plaintiff checked boxes for race, color, sex, and disability as the bases for his Charge.

## II.    Legal Standard

### A.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if

---

State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

42 U.S.C. § 2000e-5(e)(1).

under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law." *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. To shoulder this burden, "the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## B. *McDonnell Douglas* Framework

A plaintiff advancing a claim of discrimination or retaliation may prove his claim with direct or indirect (circumstantial) evidence. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987,

1000 (10th Cir. 2011).  Where the plaintiff relies on circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies.  *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008); *see also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000) ("[T]he three-part *McDonnell Douglas* burden-shifting analysis is limited to the summary judgment context.").  Under this framework, the plaintiff has an initial burden to make out a prima facie case.  *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003).  In its most basic form, a prima facie case requires the plaintiff to establish that:  (1) he "is a member of a protected class"; (2) he "suffered an adverse employment action"; and (3) "the challenged action occurred under circumstances giving rise to an inference of discrimination."  *Bennett v. Windstream Commc'ns., Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015).  Depending on the nature of discrimination and adverse employment action alleged, hybrids of the *McDonnell Douglas* framework apply.  If the plaintiff sustains his initial burden, "the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the challenged action."  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001).  If the defendant advances a legitimate non-discriminatory reason, then the burden shifts back to the plaintiff to prove the reason "is merely a pretext for unlawful discrimination."  *Id.*

## III.    Analysis

Plaintiff has asserted several claims against defendants:  (1) race discrimination and harassment under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2000e-17, and 42 U.S.C. § 1981; (2) color discrimination and harassment under Title VII of the Civil Rights Act; (3) retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"), 42 U.S.C. § 12101–12213; (4) sex discrimination and harassment under Title VII of the Civil Rights Act; and (5) disability

discrimination and harassment under the ADAAA. *See* Doc. 58 at 16 (Pretrial Order). The court

discusses each claim in the following sections.

### A.  Plaintiff's Race and Color Discrimination Claims

In Counts I and II of his Complaint, plaintiff makes claims for race and color

discrimination under Title VII and § 1981. Doc. 1 at 10–13 (Compl. ¶¶ 65–79). It is unlawful

under Title VII for an employer "to fail or refuse to hire or to discharge any individual, or

otherwise to discriminate against any individual with respect to his compensation, terms of

conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-

2(a). Section 1981 of Title 42, meanwhile, provides a cause of action when an employee can

establish that his employer engaged in "intentional discrimination" on the basis of race. *Durham

v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir. 1994). Where a plaintiff relies on circumstantial

evidence to support a claim of discrimination under either Title VII or § 1981, his claim is

subject to the *McDonnell Douglas* burden-shifting framework. *See id.* (applying framework to

§ 1981 claim); *Fischer v. Forestwood Co.*, 525 F.3d 972, 978 (10th Cir. 2008) (applying

framework in Title VII setting).

Plaintiff must carry the burden of proving the following essential elements for his Title

VII and § 1981 claims: "(1) [plaintiff] belongs to a protected class; (2) he was qualified for his

job; (3) despite his qualifications, he was discharged; and (4) the job was not eliminated after his

discharge." *Kendrick*, 220 F.3d at 1229; *see also* Doc. 58 at 16 (Pretrial Order). "By

establishing a *prima facie* case, the plaintiff in a Title VII action creates a rebuttable

'presumption that the employer unlawfully discriminated against' him." *U.S. Postal Bd. of

Governors v. Aikens*, 460 U.S. 711, 714 (1983). "The critical prima facie inquiry in all cases is

whether the plaintiff has demonstrated that the adverse employment action occurred 'under

circumstances which give rise to an inference of unlawful discrimination.'" *Kendrick*, 220 F.3d at 1227. "[T]ermination of a qualified minority employee raises the rebuttable inference of discrimination in every case in which the position is not eliminated." *Perry v. Woodward*, 199 F.3d 1126, 1140 (10th Cir. 1999); *see also Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) ("Plaintiff can also show he was terminated and replaced in a job he was qualified for, 'because it is facially illogical to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training a replacement.'" (quoting *Perry*, 199 F.3d at 1140)).

If plaintiff proves the foregoing elements, defendants must come forward with a legitimate non-discriminatory reason for discharging plaintiff. If provided, the "'full burden of persuasion'" then shifts back to plaintiff to show defendants' proffered reason is pretextual. *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) ("At this point [in the burden-shifting framework], the presumption of discrimination created by the plaintiff's prima facie case 'simply drops out of the picture.'"); *see also* Doc. 58 at 16–17 (Pretrial Order).

"A plaintiff may [discharge his burden to] show pretext by demonstrating the 'proffered reason is factually false,' or that 'discrimination was a primary factor in the employer's decision.'" *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013)). "This is often accomplished 'by revealing weakness, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.'" *Id.* (quoting *Tabor*, 703 F.3d at 1216). When evaluating a plaintiff's showing of pretext, a court "may not second guess the business judgment of the employer." *Id.* (quoting *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017)). "Evidence that the

employer 'should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility.'" *Id.* at 970–71 (quoting *Swackhammer*, 493 F.3d at 1169–70). And, a court must examine the facts supporting the adverse employment action "as they appear[ed] *to the person making the decision*," asking whether the decisionmaker "honestly believed those reasons and acted in good faith upon those beliefs." *Id.* (first quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011); then quoting *Swackhammer*, 493 F.3d at 1170).

### 1. Parties' Arguments

Defendants assert that plaintiff neither can make a prima facie case of discrimination nor establish pretext. First, defendants argue, plaintiff cannot satisfy the second element of his claim: he was qualified for his job. Specifically, defendants direct the court to the Social Security Administration's determination that plaintiff was disabled effective November 30, 2016. And, on December 16, 2016, plaintiff represented to the Kansas Department of Labor that he was unable to work, defendants assert. Plaintiff's note from the Mayo Clinic informed defendants' Medical Department—defendants argue—that plaintiff needed to "refrain from strenuous activities," which defendants interpreted to mean plaintiff required sedentary work. Doc. 62 at 23. Because defendants had no sedentary positions available to non-seniority-based employees, they contend plaintiff wasn't qualified to perform any job at the Fairfax Plant. Second, defendants argue, they consistently have articulated a legitimate, non-discriminatory reason for terminating plaintiff's employment: plaintiff's violation of attendance rules. And, third, defendants assert that plaintiff cannot establish a triable issue of pretext. Defendants contend

their offer of continued employment "undermine[s] any suggestion that [p]laintiff's race or color had anything to do with [defendants'] decision." *Id.* at 27.

Plaintiff responds, asserting that he was qualified to work on the assembly line even with his disability and, in any event, has carried his burden to establish a triable issue pretext. Plaintiff asserts that the summary judgment facts show he did no "heavy lifting" in his position on the assembly line, and that he was seated as the machine he worked with "ran its course." Doc. 68 at 42. He also argues that defendants' non-discriminatory reason for firing him is pretextual for several reasons. First, he contends, defendants' reason for terminating his employment is false. Defendants have no way to ascertain whether plaintiff followed procedures for calling in his absences, he argues, and they cannot show that plaintiff failed to comply with their call-in policy. Second, plaintiff asserts, defendants provide inconsistent reasons for terminating his employment, explaining at different times that plaintiff both was and was not fired for violating defendants' shop rules. Third, plaintiff argues that defendants failed to follow their own policies because they failed to give him a warning about his attendance and failed to consider his calls to the absentee phone line when making their decision to terminate his employment. Fourth, plaintiff compares himself to Mr. Cornelius, arguing that defendants did not discipline Mr. Cornelius even after he had admitted violating defendants' rules when he threw an object at plaintiff.

### 2. Has plaintiff established a prima facie claim of race and color discrimination?

The court first addresses whether plaintiff has made a prima facie race and color discrimination claim. Defendants do not contest that plaintiff belongs to a protected class as an African American man, that he was discharged from his job, and that his job was not eliminated after defendants fired plaintiff. *See Kendrick*, 220 F.3d at 1229.

Defendants focus their argument, instead, on whether plaintiff was qualified to perform his assembly line job. Viewing the summary judgment facts in plaintiff's favor, a reasonable jury could conclude that plaintiff was qualified for his position despite his reported disability. A doctor from defendants' Medical Department, Jane Stark, concluded that plaintiff required sedentary work after she received a note from plaintiff's treating doctor at the Mayo Clinic. The note explained that plaintiff needed to refrain from strenuous activity. But, a jury reasonably could determine that plaintiff could have done his assembly line job—which didn't require him to lift heavy objects and allowed him to sit regularly—even with his reported disability. Mr. Dall, another treating physician, opined that plaintiff "became unable to work on October 10th, 2016." Doc. 68-9 at 11 (Dall Dep. 9:4–11). Mr. Dall also testified that plaintiff was "not in a position to work at the assembly line," but he assumed that assembly line work was a "very active type of physical labor." *Id.* at 14 (Dall Dep. 12:18–13:5).

Based on the summary judgment facts describing plaintiff's exact role on the assembly line, a reasonable jury could conclude that plaintiff still was qualified for his position because Mr. Dall had no personal knowledge of the assembly line positions at the Fairfax Plant. *See id.* at 15 (Dall Dep. 13:1–12). Viewing all facts and inferences in plaintiff's favor, at the least a fact question exists whether plaintiff was qualified for his position. The court thus moves to the next step in the *McDonnell Douglas* framework: determining whether defendants have articulated a legitimate, non-discriminatory reason for terminating plaintiff's employment.

### 3. Have defendants provided a legitimate non-discriminatory reason for terminating plaintiff's employment?

Defendants assert that they terminated plaintiff's employment because he violated their attendance policy. Plaintiff argues this reason merely is a pretext, contrived to hide the real reason, *i.e.*, discrimination based on race and color, defendants fired him. Plaintiff directs the

court to inconsistencies in defendants' rationale for firing him, defendants' failure to adhere to their policies, and defendants' treatment of Mr. Cornelius—an employee, plaintiff asserts, who is similarly situated to him. But, plaintiff has adduced no admissible evidence demonstrating that defendants "didn't honestly believe" their reason for firing him—*i.e.*, his unexcused absences. *Robinson v. St. John Med. Ctr., Inc.*, 645 F. App'x 644, 649 (10th Cir. 2016). The summary judgment facts establish that defendants could "terminate . . . employment for unsatisfactory performance and disregard of GM's expectations or any unexcused absences, violation of Shop Rules or Plant/GM Policies." Doc. 62-5 at 2. Defendants' policies explain the call-in procedure for reporting absences, but caution that calling to report an absence does not mean the absence is approved.

Even though defendants didn't provide plaintiff a warning before terminating his employment and defendants' corporate representative testified that plaintiff wasn't fired for violating defendants' shop rules, these facts alone cannot negate defendants' proffered reason for firing plaintiff. A plaintiff can show pretext "with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Kendrick*, 220 F.3d at 1230. But, "[t]he mere fact that an employer failed to follow its own internal *procedures* does not necessarily suggest that the employer was motivated by illegal discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 905–06 (10th Cir. 2011) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)) (affirming district court's grant of summary judgment for employer). "[T]he standard for establishing pretext requires evidence of not just any procedural shortfall, but of a 'disturbing procedural irregularity,' often exemplified by an employer's 'falsifying or manipulating of

relevant criteria.'" *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008) (first quoting *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007); then quoting *Plotke v. White*, 405 F.3d 1092, 1104 (10th Cir. 2005)) (internal citations omitted) (affirming district court's grant of summary judgment for employer).

For example, in *Hysten*, the Tenth Circuit explained that the defendant violated an internal policy that "says nothing about the procedural protocol for terminating employees." 415 F. App'x at 906. The plaintiff had "offer[ed] no evidence of any connection between [defendant's] breach of [its internal policy] and [defendant's] decision to terminate [plaintiff's] employment." *Id.* The plaintiff also made no "attempt to explain how this procedural violation . . . [was] probative of discriminatory intent." *Id.* Plaintiff here has failed in the same way. He hasn't provided any evidence linking defendants' failure to provide a warning about his absences to a discriminatory motive or to defendants' decision to terminate plaintiff's employment. Plaintiff also hasn't adduced evidence tending to show that defendants' policy of issuing warnings "prescribe[d]" the "protocol" for terminating employment. *See id.*

Defendants' categorization of unexcused absences as a violation of shop rules in one instance and not a violation in others also does not render their proffered explanation "unworthy of belief." *DePaula*, 859 F.3d at 970; *see also Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1310–12 (10th Cir. 2005) (affirming district court's grant of summary judgment for employer and explaining that "the mere fact that the [defendant] has offered different explanations for its decision does not create a genuine question of pretext"). Plaintiff has not demonstrated that defendants' underlying proffered reason changed over the course of this litigation.

Finally, any discrepancy between defendants' response to Mr. Cornelius's admission that he violated shop rules and their response to plaintiff's unexcused absences will not negate

defendants' purported non-discriminatory reason for firing plaintiff. "Individuals are considered 'similarly situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *Lollis v. City of Eufaula*, 249 F. App'x 20, 27 (10th Cir. 2007) (first quoting *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (analyzing whether employee was "similarly situated" in Title VII race discrimination case); then citing *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004) (applying this "similarly situated" test to §§ 1981 and 1983 claims); then citing *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir.1991) ("[T]he elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII.")). Here, plaintiff cannot question defendants' business judgment to terminate plaintiff's employment by comparing it to defendants' response to Mr. Cornelius's infraction. Plaintiff hasn't demonstrated how defendants' varying responses to different policy violations calls into question defendants' non-discriminatory reason for firing plaintiff. In other words, plaintiff hasn't satisfied the Tenth Circuit's standard for showing that his unexcused absences are comparable to Mr. Cornelius's violations in the workplace.

Also, plaintiff hasn't asserted facts showing a discriminatory motive factored into defendants' decision to terminate his employment, let alone served as a primary influence. *See DePaula*, 859 F.3d at 970. The "pretext inquiry is a motive inquiry," *Sydney v. ConMed Elec. Surgery*, 275 F. App'x 748, 753 (10th Cir. 2008), and plaintiff hasn't adduced sufficient evidence to create a triable question whether defendants' motive either was driven primarily by a discriminatory factor or that defendants' proffered reason "'is unworthy of credence.'" *Taylor v. Cramer, Inc.*, No. 01-2228-GTV, 2002 WL 1461972, at *4 (D. Kan. July 3, 2002) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Viewed in the light most favorable

to plaintiff, a reasonable jury could not assess the summary judgment facts and conclude defendants' articulated reason for firing plaintiff—his unexcused absences—is "factually false." *DePaula*, 859 F.3d at 970. Likewise, a reasonable jury could not conclude that discrimination was a primary factor in that decision. *Id.* Because plaintiff has failed to shoulder his "'full burden of persuasion,'" *Swackhammer*, 493 F.3d at 1167 (quoting *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005)), to demonstrate a triable question that defendants' proffered reason is pretextual, the court grants defendants' summary judgment motion against plaintiff's claim of race and color discrimination under Title VII and § 1981.

### B. Plaintiff's Sex Discrimination Claims

Plaintiff also makes a sex discrimination claim under Title VII based on his employment's termination. Doc. 1 at 21–24 (Compl. ¶¶ 121–35). Like Title VII claims of race discrimination, Title VII sex discrimination claims require a plaintiff to demonstrate the following elements: "(1) [plaintiff] belongs to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge." *Adamson*, 514 F.3d at 1149–50. If a plaintiff doesn't belong to a protected class, a "reverse discrimination [claim] requires a determination that defendant is the 'unusual' employer that discriminates against the traditionally favored class of men, rather than women[.] . . . [A male plaintiff's] burden is higher, requiring proof of 'background circumstances' tending to establish that fact or, in the alternative, that but for his status of being a man, he would not have been terminated." *Id.* at 1141 (quoting *Notari v. Denver Water Dep't*, 971 F.2d 585, 591 (10th Cir. 1992)). The *McDonnell Douglas* burden-shifting framework described above applies to Title VII claims of sex discrimination that rely on circumstantial evidence. *Id.* at 1145. But, when a plaintiff opts to show that, but for his sex, the defendant would not have fired him, the plaintiff

"does not benefit from the presumption of intentional discrimination." *Id.* Instead, "the plaintiff must 'allege and produce evidence to support specific facts that are sufficient to support a reasonable inference that but for plaintiff's status, the challenged decision would not have occurred.'" *Id.* (quoting *Notari*, 971 F.2d at 590).

### 1. Parties' Arguments

Defendants argue that plaintiff has asserted no background circumstances establishing that defendants either discriminated against men or against plaintiff because he is a man. Because of his disability, plaintiff was not qualified to work on the assembly line, defendants contend. Defendants fired plaintiff because of his violation of defendants' policies, they assert. And, defendants reiterate their arguments opposing plaintiff's race discrimination claim to explain that their rationale for firing plaintiff was not pretextual.

Plaintiff, in turn, argues that defendants' disparate handling of his complaints against Mr. Cornelius and Ms. Hernandez establish that "male employees are treated differently than female employees." Doc. 68 at 46. Plaintiff also reiterates the arguments he made to support his Title VII race discrimination claims, asserting that he was qualified for his assembly line position and that defendants' proffered reason for firing him was pretextual.

### 2. Has plaintiff established a prima facie claim for sex discrimination?

Plaintiff fails to carry the heavier burden of establishing background circumstances that tend to establish defendants discriminate against men. Plaintiff doesn't compare defendants' actions involving him to actions involving other employees. Instead, he compares defendants' treatment of two other employees, Mr. Cornelius and Ms. Hernandez. The summary judgment facts show that the procedures defendants followed when investigating plaintiff's complaints differed between Mr. Cornelius and Ms. Hernandez. Specifically, defendants interviewed

plaintiff, Mr. Cornelius, and a third employee identified as a witness when responding to plaintiff's complaint against Mr. Cornelius. But, when responding to plaintiff's complaint against Ms. Hernandez, defendants didn't interview anyone other than Ms. Hernandez, produce documents containing an investigation summary, or review plaintiff's complaint with him. Mr. Cornelius was moved away from plaintiff's work area and received a non-disciplinary Employee Contact form that defendants placed in his file. Ms. Hernandez merely received an Employee Contact form in her file.

But, the incidents that prompted plaintiff to complain separately about Mr. Cornelius and Ms. Hernandez aren't comparable with one another. Mr. Cornelius admitted to throwing an object at plaintiff, and plaintiff also complained that Mr. Cornelius had said offensive things to him and touched him in unwelcome ways. But, plaintiff complained that Ms. Hernandez had baked and presented him with two offensive cakes. Viewed in plaintiff's favor, a jury could not reasonably conclude that plaintiff has adduced sufficient facts tending to show that defendants treated Mr. Cornelius and Ms. Hernandez differently because of their genders. *See Cash v. Boeing Co.*, 76 F. Supp. 2d 1229, 1233–34 (D. Kan. 1999) (considering "alleged disparate treatment accorded other workers" that plaintiff referenced to satisfy the background circumstances test and concluding that the incidents were "so distinct from [plaintiff's] situation that they cannot serve as any evidence of discriminatory intent"); *Ewing v. TWA Rest. Grp., Inc.*, No. 08-2024-CM, 2009 WL 648924, at *3 (D. Kan. Mar. 12, 2009) (concluding that plaintiff had provided no evidence of "background circumstances tending to indicate defendant discriminates against the majority" because, "[a]side from the fact that plaintiff was white and the manager . . . was black, plaintiff provides no evidence that defendant discriminated against other white employees"). Plaintiff has adduced facts showing only that defendants responded differently to

Mr. Cornelius and Ms. Hernandez's different policy violations. This assertion, alone, is insufficient to demonstrate that defendants are "the 'unusual' employer that discriminates against the traditionally favored class of men." *Adamson*, 514 F.3d at 1141 (quoting *Notari*, 971 F.2d at 591).

The court concludes that plaintiff has not established a prima facie case of sex discrimination under Title VII. The court thus grants defendants' summary judgment motion against plaintiff's sex discrimination claim.

### C. Plaintiff's Harassment Claims

Next, plaintiff has asserted claims based on harassment and a hostile work environment under Title VII, § 1981, and the ADAAA. Doc. 1 at 10–16 (Compl. ¶¶ 65–94), 21–24 (Compl. ¶¶ 121–35), 25–28 (Compl. ¶¶ 145–60). These claims require him to show the following elements: "(1) [plaintiff] is a member of a protected group; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [race, sex, or disability]; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) (first three alterations added) (evaluating racial harassment claim); *see also Dick v. Phone Directories Co.*, 397 F.3d 1256, 1262–63 (10th Cir. 2005) (evaluating sexual harassment claim); *Lanman v. Johnson Cty., Kan.*, 393 F.3d 1151, 1155 (10th Cir. 2004) (holding that "hostile work environment claim[s] can be brought under the ADA").

Plaintiff first concedes that he has not exhausted his administrative remedies for his claims of harassment against Mr. Cornelius. Doc. 68 at 48–49. Instead, he focuses on two other incidents: (1) the alleged harassment by Ms. Hernandez based on race, color, and sex; and (2)

defendants' offer of employment in November 2016, which, he argues, "constitutes both harassment and retaliation" based on his disability because plaintiff's new start date "would preclude [him] from the terms of employment he earned from his previous duration of employment." *Id.* at 51. When analyzing plaintiff's harassment claims, the court thus focuses on these two incidents.

### 1. Has plaintiff established a prima facie claim of harassment based on race, color, and sex?

Defendants could be liable on plaintiff's sexual harassment claim under two different theories: "(1) vicarious liability; or (2) negligence." *Chavez-Acosta v. Sw. Cheese Co., LLC*, 610 F. App'x 722, 729 (10th Cir. 2015) (citations omitted). "Generally, the vicarious liability theory applies only when the harasser is a supervisor, while the negligence theory applies when the harasser is a co-worker." *Id.* (citing *Kramer v. Wasatch Cty. Sheriff's Office*, 743 F.3d 726, 755 (10th Cir. 2014)); *see also Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1155 (10th Cir. 2008) (concluding that employer could be held liable on plaintiff's § 1981 racial harassment claim because it "failed to 'discharge its obligation by taking appropriate remedial or preventive action'" (quoting *Adler*, 144 F.3d at 676)); *Faragalla v. Douglas Cty. Sch. Dist. RE 1*, 411 F. App'x 140, 151–52 (10th Cir. 2011) (applying negligence standard to Title VII and § 1981 hostile work environment claims). Plaintiff's claim here contends in part that Ms. Hernandez, a coworker, harassed him based on his race, color, and sex. It is uncontroverted that Ms. Hernandez did not act as plaintiff's supervisor. The court thus considers whether defendants acted negligently in response to plaintiff's complaint about Ms. Hernandez's actions.

To establish negligence under this brand of racial or sexual harassment, plaintiff must show—in addition to the four elements of his harassment claims—that defendants "had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice

of the harassment." *Adler*, 144 F.3d at 673 (citation omitted); *see also Macias v. Sw. Cheese Co., LLC*, 624 F. App'x 628, 637 (10th Cir. 2015). Plaintiff can show actual knowledge "where the plaintiff has reported harassment to management-level employees." *Adler*, 144 F.3d at 673 (citation omitted).

Here, the court evaluates whether plaintiff has adduced sufficient facts to make a prima facie case of harassment based on race, color, and sex. Specifically, the court focuses on whether the harassment plaintiff experienced was severe or pervasive, as the Tenth Circuit requires. *Smith v. Nw. Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 (10th Cir. 1997) (conduct must be "sufficiently pervasive or sufficiently severe"). Plaintiff has conceded he cannot base his harassment claims on Mr. Cornelius's actions because he failed to report them in a timely manner to the EEOC. *See* Doc. 68 at 48–49. Also, plaintiff never provides any facts showing he notified defendants about comments that he asserts his coworkers made about his penis. And, he has adduced no evidence showing how defendants could have had constructive notice of these comments. The sole incident plaintiff reported to his supervisor, Joe Heany, and then to Labor Relations Representative Michael Poirier, involved the penis cakes that plaintiff asserts Ms. Hernandez baked.

The Supreme Court has not reduced the inquiry whether conduct was severe or pervasive to a "'mathematically precise test.'" *Morton v. Steven Ford-Mercury of Augusta, Inc.*, 162 F. Supp. 2d 1228, 1241 (D. Kan. 2001) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). To the contrary, our Circuit has explained the governing rule as follows:

> Some factors to be weighed include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [*Harris*, 510 U.S.] at 23[.] Because frequency is merely one factor in the analysis, an isolated incident may suffice if the conduct is severe and threatening. *See, e.g.*, *Lockard* [*v. Pizza Hut, Inc.*], 162 F.3d [1062, 1072 (10th Cir.

1998)] (allowing claim based on single incident); [*Smith*, 129 F.3d at 1413] (conduct must be "sufficiently pervasive or sufficiently severe"). The harassing conduct must be "both objectively and subjectively abusive." *Lockard*, 162 F.3d at 1071.

*Morton*, 162 F. Supp. 2d at 1241. In *Lockard*, for example, the Tenth Circuit concluded that a "single incident"—one where a customer at a restaurant grabbed the plaintiff's hair twice, grabbed her breast, and put his mouth on it—may be "sufficient to create an abusive environment." 162 F.3d at 1072. In other words, under facts as abusive as *Lockard*'s, a reasonable jury could conclude that the conduct plaintiff complained about was sufficiently severe. The Circuit also has considered a single incident of alleged harassment where a plaintiff's coworker "inappropriate[ly] touch[ed]" her and, when the plaintiff told her coworker "his conduct was inappropriate," he "lifted [her] either by the waist or by the wrists onto [a] pool table and pinned her back against the pool table." *Creamer v. Laidlaw Transit, Inc.*, 86 F.3d 167, 169 (10th Cir. 1996). In *Creamer*, the Circuit affirmed the district court's order granting summary judgment, which had concluded that the conduct plaintiff asserted "fell short" of the standards for severity and pervasiveness. *Id.* at 170.

Plaintiff asserts that the penis cakes and his coworkers' comments about the size of his penis were unwelcome and created a hostile work environment. He also contends that defendants' response—*i.e.*, reminding Ms. Hernandez of defendants' policies and placing an Employee Contact form in her file—were not reasonably calculated to prevent plaintiff from facing subsequent harassment.

The court concludes, first, that plaintiff has adduced sufficient evidence to raise a triable issue whether defendants took steps "'reasonably calculated to end the harassment'" he experienced. *Tademy*, 614 F.3d at 1148 (quoting *Adler*, 144 F.3d at 676). Even though plaintiff reported the cakes and his discomfort with them to his supervisor, Joe Heany, Mr. Heany took no

action in response. And, after plaintiff reported the cakes to Mr. Poirier, Mr. Poirier merely spoke with Ms. Hernandez, warned her about defendants' Anti-Harassment policy, and issued her an Employee Contact form. Based on the absence of investigative steps and disciplinary decisions, a jury could find that defendants failed to take steps reasonably calculated to end the harassment plaintiff experienced.

Next, the court analyzes whether Ms. Hernandez's conduct was severe or pervasive. Viewing the facts here in plaintiff's favor, the penis cakes presented to plaintiff for his birthday, while distasteful, do not rise to the level of severity the Circuit has described for a single episode of harassment. Plaintiff reported to Mr. Poirier that the cakes were offensive to him and made him uncomfortable. Plaintiff also testified that the workplace was a "stressful environment" because he was around people who thought of him as a "sexual object." Doc. 68-5 at 144 (Redmon Dep. 142:6–16). But, the summary judgment facts also establish that plaintiff posted photos of the cakes on his Facebook page. And, plaintiff provides no facts showing that the cakes or any associated behavior during that incident were "severe and threatening." *Morton*, 162 F. Supp. 2d at 1241. Taken together, the facts of the alleged harassment—the incident involving the cakes—fail to create a triable issue whether the penis cakes created a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive working environment." *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (internal quotations omitted).

Plaintiff has failed to adduce evidence capable of supporting an essential element of his harassment claims based on race, color, and sex. Namely, he has failed to marshal evidence that the single incident of harassment he reported and complained about—the cakes—were

sufficiently severe to establish prima facie harassment claims under Title VII and § 1981. The court thus grants defendants' summary judgment motion against these claims.

### 2. Has plaintiff established a prima facie claim of harassment based on his disability?

A hostile work environment claim under the ADAAA requires a plaintiff to "present evidence from which a rational jury could find that [the] workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the terms, conditions, or privileges of employment, and the harassment stemmed from disability-related animus." *Schlecht v. Lockheed Martin Corp.*, 626 F. App'x 775, 779 (10th Cir. 2015); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997) ("To survive summary judgment, the plaintiff must show that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was based on the victim's . . . disability.").

Plaintiff asserts that defendants' offer to rehire him in November 2016 constitutes harassment. On November 17, 2016, plaintiff gave defendants' Medical Department notes from his treating physician at the Mayo Clinic that described the physical limitation affecting his employment. Later, defendants offered plaintiff a position as a two-days-per-week temporary employee with a new hire date. This new hire date, plaintiff argues, deprived him of employment benefits that temporary employees receive after working for defendants for a certain amount of time. Plaintiff compares this employment offer with the offer defendants made to him in September 2016, when defendants reinstated his employment with his original start date. The

only difference between the two offers, plaintiff contends, was plaintiff's physical limitation when he returned to work in November 2016.

But, plaintiff doesn't explain how defendants' November 2016 employment decision shows that plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the terms, conditions, or privileges of [his] employment." *Roecker v. Brennan*, No. 15-7201-DDC-JPO, 2017 WL 445504, at *15 (D. Kan. Feb. 2, 2017). Defendants fired plaintiff on November 2, 2016. Their employment offer later that month could not have affected the workplace because plaintiff was not employed when defendants extended the offer. The court thus concludes that plaintiff has failed to provide facts supporting an essential element of his ADAAA harassment claim. The court thus grants defendants' summary judgment motion against that claim.

### D. Plaintiff's Retaliation Claims

Plaintiff also has asserted retaliation claims under Title VII and § 1981. Doc. 1 at 16–17 (Compl. ¶¶ 95–103), 19–21 (Compl. ¶¶ 111–20), 24–25 (Compl. ¶¶ 136–44), 29–30 (Compl. ¶¶ 161–69). His "*prima facie* case [must] demonstrat[e] that (1) he . . . engaged in protected activity, (2) he . . . suffered a material adverse action, and (3) there was a causal connection between the protected activity and the adverse action." *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015) (citing *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011)). Retaliation claims brought under § 1981 are limited to retaliation that is based on protected activity involving race, not sex. *Runyon v. McCrary*, 427 U.S. 160, 167 (1976). And, "[w]hen a plaintiff presents only circumstantial evidence, the *McDonnell Douglas* burden-

shifting framework typically applies." *Id.* (citing *Ward v. Jewell*, 772 F.3d 1199, 1202 (10th Cir. 2014)).

### 1. Parties' arguments

Defendants argue that plaintiff has failed to exhaust his administrative process for retaliation claims because, in each of the two Charges of Discrimination he filed with the EEOC, he didn't identify retaliation as one of the bases for his Charge. Plaintiff responds, asserting that his first Charge of Discrimination with the EEOC, filed on November 18, 2016, is the protected activity against which defendants retaliated. He filed his Charge a few days before defendants offered him a two-day temporary position with a new hire date. The new hire date, plaintiff argues, deprived him of benefits he had accrued during his earlier temporary employment. And, in his March 22, 2017, Amended Charge of Discrimination, plaintiff explained that his "termination based on [his] disability caused [him] to lose [his] full time temp status and the benefits therein." Doc. 68 at 60. Because he filed his original Charge before the purported retaliatory act, plaintiff asserts that "the retaliatory action is reasonably related to the charge." Doc. 68 at 58; *see also Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir. 1988) ("[A]n act committed by an employer in retaliation for the filing of an EEOC complaint is reasonably related to that complaint, obviating the need for a second EEOC complaint."); *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992) (holding plaintiff need not exhaust administrative remedies for post-EEOC charge retaliation claim because conciliatory purpose of exhaustion no longer advanced). Defendants were put on notice of his retaliation claims, plaintiff argues,

because of his explanation of his post-termination loss of benefits.  Thus, he contends, the court shouldn't bar these claims as administratively unexhausted.

On the merits of his retaliation claim, plaintiff asserts that defendants made their November 2016 employment offer just days after plaintiff filed his first EEOC Charge.  He relies on temporal proximity between his protected activity and defendants' employment offer with fewer benefits to establish "'an inference of the existence of a causal connection between the two events.'"  *Id.* at 69 (quoting *EEOC v. PVNF, LLC*, 487 F.3d 790, 804 (10th Cir. 2007)).  But, defendants reply, directing the court to an exhibit showing they received no notice of plaintiff's November 18, 2016, Charge of Discrimination.  The EEOC authored a letter dated November 30, 2016, to defendant General Motors' then-counsel Roderick Gillum, informing him of plaintiff's Charge.  Doc. 70 at 13–14 (citing Doc. 70-4 at 2).

### 2.    Did plaintiff administratively exhaust his retaliation claims?

"[A] plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim."  *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185–86 (10th Cir. 2018); *see also Fort Bend Cty. v. Davis*, No. 18-525, slip op. at 1–2 (June 3, 2019) ("Prerequisites to suit like Title VII's charge-filing instruction are not [jurisdictional]; they are properly ranked among the array of claim-processing rules that must be timely raised to come into play.").  "The primary distinction between treating exhaustion as jurisdictional rather than as an affirmative defense, is that as an affirmative defense it is subject to waiver and estoppel.  The difference is immaterial where waiver and estoppel do not come into play."  *Brown v. Keystone Learning Servs.*, No. 17-2211-JAR, 2018 WL 6042592, at *5 (D. Kan. Nov. 19, 2018) (appeal docketed March 25, 2019).  And, courts "must liberally construe the

administrative charge to determine whether a particular claim has been exhausted." *Id.* Courts must look to "'the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge.'" *Id.* (quoting *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007)).

Here, plaintiff did not select retaliation as a basis for any of his Charges. And, it is uncontroverted that defendants have not waived their affirmative defense of administrative exhaustion—they asserted the defense in their Answer (Doc. 12 at 53). But, the Tenth Circuit directs that a purportedly retaliatory action that follows an EEOC Charge is "reasonably related" to that Charge and doesn't require a plaintiff to file a second Charge to exhaust his administrative remedies. *See Brown*, 864 F.2d at 682; *see also Nealon*, 958 F.2d at 590. The court thus concludes that plaintiff has exhausted his administrative remedies for his retaliation claims before bringing them as part of his lawsuit under Title VII.[3]

### 3. Has plaintiff established a prima facie claim of retaliation?

Next, the court considers the merits of plaintiff's retaliation claims. Defendants argue that plaintiff has failed to establish a causal connection between his protected activity and the alleged adverse employment action. Plaintiff appears to assert that his first Charge of Discrimination with the EEOC, filed on November 18, 2016, is the protected activity that spurred defendants to retaliate. He filed his Charge a few days before defendants offered him a two-day temporary position with a new hire date. The new hire date, plaintiff argues, deprived him of benefits he had accrued during his earlier temporary employment. He relies on temporal proximity between his protected activity and defendants' employment offer with fewer benefits

---

[3]    Unlike a Title VII retaliation claim, no administrative exhaustion requirement applies to claims brought under § 1981. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 455 (2008).

to establish "'an inference of the existence of a causal connection between the two events.'" Doc. 68 at 69 (quoting *PVNF*, 487 F.3d at 804).  But, defendants reply, they received no notice of plaintiff's November 18, 2016, Charge of Discrimination until November 30, 2016, when the EEOC dated a letter to defendant General Motors' then-counsel Roderick Gillum, informing him of plaintiff's Charge.  Doc. 70 at 13–14 (citing Doc. 70-4 at 2).

Plaintiff offers no evidence suggesting that defendants had notice of his first EEOC Charge before they offered him two-day temporary employment with a start date of November 28, 2016.  They made that offer two days before the EEOC dated its letter informing defendants that plaintiff had filed a Charge of Discrimination.  Plaintiff asserts that his Charge "result[ed]" in the "materially adverse" employment offer that deprived him of benefits, but he can't explain how defendants knew about the Charge before making the allegedly retaliatory offer.  *See Bertsch v. Overstock.com*, 684 F.3d 1023, 1028 (10th Cir. 2012) ("A prima facie retaliation case is made if the plaintiff shows that she engaged in protected opposition to discrimination, and, as a result, suffered materially adverse action . . . ." (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006))), *abrogated on other grounds*, *Lincoln*, 900 F.3d at 1185–86; *see also Lincoln*, 900 F.3d at 1212–13 ("[D]ecisionmaker(s) must have knowledge of the protected activity.  For how can decisionmakers retaliate against an employee for taking protected activity if they do not know about the protected activity?").

Consistent with these case authorities, the court concludes that plaintiff has failed to adduce facts supporting an essential element of his ADAAA retaliation claim.  The court thus grants defendants' summary judgment motion against this claim.

### E.  Plaintiff's ADAAA Discrimination Claim

Plaintiff asserts a separate discrimination claim based on his disability under the ADAAA.  Doc. 1 at 25–28 (Compl. ¶¶ 145–60).  "[T]o establish a prima facie case of discrimination under the ADAAA, a plaintiff must show that (1) he is disabled as defined under the ADAAA; (2) he is qualified, with or without reasonable accommodation by the employer, to perform the essential functions of the job; and (3) he was discriminated against because of his disability."  *Adair v. City of Muskogee*, 823 F.3d 1297, 1304 (10th Cir. 2016).  The ADAAA provides that "'[t]he definition of disability . . . be construed in favor of broad coverage.'"  *Id.* at 1306 (quoting ADA Amendments Act of 2008, Pub. L. No. 110-325, § 4(a), 122 Stat. 3553 (codified as amended 42 U.S.C. §§ 12101–12213)).  And, the Tenth Circuit considers the following factors when determining "whether a particular function is essential":

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions; (3) the time spent performing the particular function; (4) the consequences if the individual cannot perform the function; (5) any collective-bargaining agreement; (6) the work experience of those in the position in the past; and (7) the current work experience of those in similar positions. *Id.* at 1307 (citing 29 C.F.R. § 1630.2(n)(3)).

To satisfy the third element of a prima facie case, a plaintiff must "present some affirmative evidence that disability was a determining factor in the employer's decision." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997); *see also Markham v. Boeing Co.*, No. 10-1363-MLB, 2011 WL 6217117, at *4–5 (D. Kan. Dec. 14, 2011) (applying *Morgan* standard to claim brought under ADAAA).  "This burden is 'not onerous' but it is also 'not empty or perfunctory.'"  *Morgan*, 108 F.3d at 1323–24 (citation omitted) (quoting *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995)).  In other words, "[t]he plaintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, [he] would be entitled to judgment as a matter of law."  *Id.* at 1324.

### 1. Has plaintiff established a prima facie claim of discrimination under the ADAAA?

As with plaintiff's race and color discrimination claims, defendants, for purposes of summary judgment, seem to challenge just one element of the analysis: whether plaintiff was qualified for his position on the assembly line. Defendants did not challenge—at least at summary judgment—whether plaintiff had a disability. And, the court again determines that a reasonable jury could conclude plaintiff was qualified to perform his assembly line job despite his reported disability. Defendants' corporate representative, Ca-Sandra Tutt, explained that defendants maintain current job elements and descriptions. Doc. 68-3 at 19 (Tutt Dep. 66:22–68:22). But, in their responses to plaintiff's Requests for Production, defendants represented that they "do not maintain job descriptions or historic Job Element Sheets." Doc. 68-13 at 8. The parties have not provided a written job description for plaintiff's position when he worked for defendants.

Defendants also assert that employees in plaintiff's position were required to walk and stand as part of their jobs. But, defendants don't contest that plaintiff—and other employees working on the same assembly line—spent some time working in a seated position. Jane Stark, a doctor employed in defendants' Medical Department, concluded that plaintiff required sedentary work after receiving a note from his treating doctor at the Mayo Clinic. That note explained that plaintiff needed to refrain from strenuous activity. But, a jury reasonably could determine that plaintiff could have done his assembly line job—which didn't require him to lift heavy objects and allowed him to sit regularly—even with his reported disability. Though plaintiff's treating doctor at the Mayo Clinic opined that plaintiff was "not in a position to work at the assembly line," that doctor also assumed that assembly line work was a "very active type of physical

labor." Doc. 69-9 at 14 (Dall Dep. 12:18–13:5). A reasonable jury could conclude otherwise based on the summary judgment facts describing plaintiff's exact role on the assembly line.

But, plaintiff hasn't met his burden to show his disability was a determining factor in his termination. In his response to defendants' summary judgment motion, plaintiff identifies no facts explaining how his disability factored into defendants' decision to fire him in November 2016. In fact, the summary judgment facts demonstrate that plaintiff only presented information about his physical limitation to defendants on November 17, 2016—more than two weeks after defendants terminated his employment. Without additional facts or argument—and plaintiff provides none—a reasonable jury could not conclude that plaintiff has satisfied his burden on the third element of his ADAAA discrimination claim.

Though plaintiff's qualification for his position presents a triable issue, plaintiff has not provided sufficient facts or any argument about whether his disability was a determining factor in his November 2016 termination. Thus, since plaintiff has failed to make a prima facie claim for discrimination under the ADAAA, the court grants defendants' summary judgment motion against this claim.

### F. Plaintiff's ADAAA Retaliation Claim

Finally, plaintiff brings a separate retaliation claim under the ADAAA. Doc. 1 at 29–30 (Compl. ¶¶ 161–69). To make a prima facie claim, he must demonstrate that "(1) [he] engaged in a protected activity; (2) [defendants] took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity

and the adverse action." *Dewitt*, 845 F.3d at 1318–19. Like plaintiff's other claims, his

ADAAA retaliation claim also applies the *McDonnell Douglas* burden-shifting framework.

The parties' briefing on plaintiff's ADAAA retaliation claim is sparse, but their papers

make the same arguments about the merits of plaintiff's Title VII and § 1981 claims.[4] The court

grants summary judgment against plaintiff's ADAAA retaliation claim for the same reason that it

granted summary judgment against his Title VII and § 1981 retaliation claims: defendants

received no notice of his first EEOC Charge (plaintiff's protected activity) before they offered

him the two-days-per-week temporary position with fewer benefits (their purported retaliatory

conduct). Specifically, the EEOC sent a letter dated November 30, 2016, to defendant General

Motors' then-counsel Roderick Gillum, informing him of plaintiff's Charge. Doc. 70 at 13–14

(citing Doc. 70-4 at 2). Plaintiff offers no evidence demonstrating that his Charge "result[ed]" in

the "materially adverse" employment offer that—according to plaintiff—deprived him of

benefits, and he doesn't explain how defendants knew about the Charge before making the

allegedly retaliatory offer. *See Bertsch*, 684 F.3d at 1028 ("A prima facie retaliation case is

made if the plaintiff shows that she engaged in protected opposition to discrimination, and, as a

result, suffered materially adverse action . . . ." (citing *White*, 548 U.S. at 68)); *see also Lincoln*,

900 F.3d at 1212–13 ("[D]ecisionmaker(s) must have knowledge of the protected activity. For

---

[4]    In their Answer to the Complaint, defendants assert that plaintiff's "claims, including but not limited to his claims of retaliation, are barred in whole or in part to the extent [p]laintiff alleges claims or seeks relief that exceed the scope of any administrative charges, and therefore were not administratively exhausted." Doc. 12 at 53. But, defendants do not raise that affirmative defense in their summary judgment arguments opposing plaintiff's ADAAA retaliation claim. Though they have not waived that defense, the court focuses on defendant's causation argument. *See* Doc. 70 at 13–14; *see also Lincoln*, 900 F.3d at 1185–86 (holding that court still may assume jurisdiction over a claim even if plaintiff fails to file EEOC charge about an employment incident).

how can decisionmakers retaliate against an employee for taking protected activity if they do not know about the protected activity?").

The court thus concludes that plaintiff has failed to adduce facts capable of supporting an essential element of his ADAAA retaliation claim. The court grants defendants' summary judgment motion against this claim.

### G. Plaintiff's Claims for Economic Damages

The court has granted defendants' summary judgment motion against each of plaintiff's claims. The court thus does not need to address the parties' summary judgment arguments about plaintiff's claims for economic damages.

## IV. Conclusion

For the reasons explained above, the court grants defendants' summary judgment motion (Doc. 61) against all of plaintiff's claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants General Motors Company and General Motors LLC, GMVM Fairfax Assembly Plant's Motion for Summary Judgment (Doc. 61) is granted.

**IT IS FURTHER ORDERED BY THE COURT THAT** the Clerk is directed to enter a judgment consistent with this Order and close this case.

**IT IS SO ORDERED.**

**Dated this 6th day of June, 2019, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
